**Opinion filed September 30, 2021**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-19-00360-CR & 11-19-00361-CR
_____

### BRADLY DON GARDNER, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law**
**Taylor County, Texas**
**Trial Court Cause Nos. 1-949-18 & 1-971-18**

## M E M O R A N D U M   O P I N I O N

Appellant, Bradly Don Gardner, was charged by separate information for the Class A misdemeanor offenses of (1) assault family violence, our Cause No. 11-19-00360-CR, TEX. PENAL CODE. ANN. § 22.01(a)(1) (West Supp. 2020), and (2) violation of an emergency protective order, our Cause No. 11-19-00361-CR, PENAL § 25.07(a)(2)(c). The jury convicted Appellant of both offenses and assessed his punishment at 240 days' confinement in the Taylor County jail and a $1,500 fine

for the offense of assault family violence, and thirty days' confinement and a $500 fine for violating the emergency protective order. The trial court sentenced Appellant accordingly. On appeal, Appellant challenges the sufficiency of the evidence to support each conviction. We affirm.

I. *Factual Background*

A. *The Assault*

On the day of the assault, Appellant lived with his wife A.A., the victim, and their three young children in Abilene, Texas. Appellant had finished work around noon and went to a bar with his coworkers, where he consumed alcohol until approximately 7:30 that evening. At that time, Appellant left the bar to go home—he was intoxicated.

A.A. testified that when Appellant arrived at their house, he was too intoxicated to unlock the front door and he fell to the ground outside. A.A. found him there and told him to leave because she did not want to fight with him that night. A.A. testified that Appellant had come home intoxicated on previous occasions. Appellant pushed past her and entered the house; the couple then argued. A.A. retrieved and was holding Appellant's pickup keys; he tried to take them from her, and a struggle ensued. According to A.A., she tried to walk away from Appellant, but he followed her into the kitchen and then into the bedroom. There, they continued to argue and Appellant shoved A.A. into the crib and bedroom dresser.

As they struggled over the pickup keys, Appellant positioned himself behind A.A. and pressed his weight onto her, forcing her down until she was eventually in a fetal position on the bedroom floor. A.A. testified that her hands became entangled in the pickup keys, and she could not let go of them. She stated that she screamed for Appellant to stop struggling with her and that, when he did not, she screamed for help. She could not breathe, and she told Appellant, "I can't breathe." A.A. stated that she was in pain while Appellant was on top of her and that, when he eventually

yanked the pickup keys out of her left hand, she had various cuts and bruises. Unfortunately, their children witnessed this physical altercation.

Appellant walked out of the house with the pickup keys. A.A. then called 9-1-1. Appellant attempted to take one of their young children with him, but A.A. ran outside, picked up the child, and took the child back inside the house. She locked the door and engaged the "C" lock; however, Appellant kicked in the door. A.A. and the children ran to the bathroom and locked that door, but Appellant kicked in that door as well. The police arrived shortly thereafter. In addition to the injuries that she sustained when the pickup keys were ripped from her left hand by Appellant, A.A. also sustained bruising on her back and hips from their physical altercation.[1]

Officers Jerimiah Torrez and Kenneth Welch of the Abilene Police Department responded to the 9-1-1 call. Officer Welch testified that the call sheet indicated that an intoxicated person (Appellant) was attempting to leave the residence and take the children with him. Even though Appellant also called 9-1-1, Officer Welch testified that this was not unusual in domestic disturbance cases. He stated that when one party calls, it is common for the other party to also call the police to provide their version of events or to explain that they are the victim.

When the officers arrived at the scene, they found Appellant, A.A., and the three children present. A.A. was very distraught; her face was red; her eyes were puffy; and she had been crying. She was out of breath, and Officer Torrez stated that he could tell that the incident had been an emotional encounter for her. A.A.'s left hand had visible injuries that were consistent with the pickup keys having been forcefully taken from her left hand.

---

[1]Notably, the information specifically only charges that Appellant assaulted A.A. "by pinning her to the ground and/or taking keys from her."

Appellant appeared to be intoxicated; his eyes were bloodshot; he was swaying; and he had a noticeable odor of alcohol. Both officers testified that Appellant admitted to drinking eight or nine drinks at a local bar earlier that night. On the other hand, A.A. was not intoxicated. The front door had visible damage from where it had been kicked in. Despite the physical damage to the residence and injuries that A.A. had sustained, Appellant denied that any altercation had occurred between them. Officer Torrez thereafter arrested Appellant for assault family violence. He described Appellant as "belligerent," highly agitated, and out of control. Officer Torrez also noted that, after reaching the Taylor County jail, Appellant "wanted to fight everybody" and had to be restrained by jail personnel.

Appellant testified at trial. According to Appellant, his marriage with A.A. had been "generally" good before the night of the offense, although they occasionally fought. He testified that, on the night of the incident, he met a group of coworkers at a restaurant, but left to go home around 7:30 p.m.

While at the restaurant, A.A. had called Appellant several times; however, he ignored her calls because he thought that she would be angry with him for drinking and not coming home, and this would embarrass him in front of his coworkers. Appellant said that, about two months prior to the incident, A.A. had given him an ultimatum to either stop drinking or she would leave him. He stated that he could not quit drinking because he was an alcoholic.

Appellant testified that, when he arrived home that evening, he found A.A. with three adult friends in the house, smoking marihuana. This made him angry because their three children were in the room. The three adults left, and Appellant and A.A. began to argue. During their argument, Appellant tried to remove the keys to his pickup from her left hand, and in doing so, he lost his balance and they both fell onto the floor. Appellant testified that he then got up, walked outside, and called the police.

Appellant denied ever assaulting A.A. He claimed that he did not believe his actions would hurt her and that he did not intend to injure her when he took the pickup keys from her left hand. He testified that he tried to take the pickup keys because he was worried about his children's safety. According to Appellant, A.A. was on pills, was bipolar, and had been smoking marihuana.

When Appellant was asked why the police had reported that they did not detect the odor of marihuana in the house, Appellant suggested that the police were withholding evidence, including bodycam footage. He also testified that A.A. had unplugged the interior security cameras in the house so that he could not show the police the camera footage that would confirm his version of events. Appellant denied wrestling A.A. to the ground; he claimed that he had tripped and lost his balance because he was intoxicated. According to Appellant, he had not been sober for more than four or five weeks at that time.

During the State's cross-examination, Appellant admitted that he kicked in the front door. He testified that he knew that A.A. did not want to give him the keys to his pickup and that she had tried to stop him from taking the keys. He further admitted that he had been drinking on the day of the incident from about 12:45 p.m. to 7:30 p.m., although he claimed that his judgment was not impaired.

Appellant's mother, Gayle Gardner, testified that it was an exaggeration that the front door had been broken down; the "C" chain had been bent and the door was cracked, but it was still on its hinges. She agreed that Appellant had been battling a drinking problem since he was in high school.

B. *Violation of the Protective Order*

The morning after the assault, a Taylor County Justice of the Peace signed an emergency protective order that prohibited Appellant from communicating in any manner with A.A., except through an attorney. Appellant was informed of the existence and the conditions of the protective order later that day—before he posted

5

bond and was released. After Appellant was released from the county jail, he called A.A. and also sent her a one-word text message, in violation of the emergency protective order.

Detective Michael Scott was assigned to investigate Appellant's protective order violations. He explained that an emergency protective order even prohibits non-threatening contact. Detective Scott testified that making a phone call or sending a text message constitutes prohibited communication under the protective order. Detective Scott interviewed Appellant after Appellant had called and texted A.A.; the interview was recorded. Detective Scott stated that Appellant initially denied making those communications; however, he later changed the content of his statement. During the interview, Appellant suggested that A.A. may have had access to and used his cellphone through an iPad. Appellant claimed that the call and text could have been initiated the night before but that the transmissions could also have been delayed until the following day. According to Detective Scott, Appellant eventually admitted that he had called and texted A.A. after he was released from the county jail and after the conditions of the protective order had been explained to him. Appellant also claimed that his call and text message to A.A. were in response to the calls that she had made to him the night before.

Appellant testified that Detective Scott had deceived him into admitting that he had contacted and communicated with A.A. in violation of the protective order. Appellant asserted that it was possible to make inadvertent calls from his iPhone. He claimed that if his iPhone was turned off because it had no charge when he had attempted to send the text message to A.A. the night before, it was possible the text would not have been sent until he charged his phone the next day.

## II. *Standard of Review – Sufficiency of the Evidence*

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the

standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including improperly admitted evidence, and defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393 S.W.3d 763, 767–68 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim.

App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

We first address Appellant's sufficiency challenge to his assault-family-violence conviction. Appellant contends that the evidence is insufficient to show that he had the requisite *mens rea* to commit the assault. We disagree.

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse. PENAL § 22.01(a)(1). Any physical pain, however minor, will suffice to establish bodily injury. *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012); *see* PENAL § 1.07(a)(8). The offense can be established if the accused possessed any of the three mental states listed above.

A person acts *intentionally*, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2021). A person acts *knowingly*, or with knowledge, with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts *knowingly*, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person acts *recklessly*, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk

that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* § 6.03(c). Thus, to find Appellant guilty of assault family violence as charged in the information, the jury was required to determine beyond a reasonable doubt that, at a minimum, Appellant acted recklessly in causing bodily injury to his spouse, A.A.

Appellant admitted that he had consumed alcohol for several hours before the incident with A.A. and that he was intoxicated during their encounter. A.A. and the other witnesses at the scene agreed that Appellant was highly intoxicated. A.A. testified that she and Appellant physically struggled over the possession of the keys to Appellant's pickup. She stated that, in the course of this struggle, Appellant shoved her several times and pressed his weight onto her back, forcing her into a fetal position. The pickup keys became entangled in her left hand so that she could not let go of them. She screamed for Appellant to stop assaulting her and screamed for help when he would not stop. A.A. could not breathe, and she told him so. A.A. testified that she was in pain while Appellant was on top of her and that she received various cuts and bruises when he pulled the entangled pickup keys from her left hand. Based on these facts, the jury could have reasonably found that Appellant was aware of but consciously disregarded a substantial and unjustifiable risk of causing bodily injury to A.A. when he wrestled her to the ground, wrenched the pickup keys from her left hand, and ignored her pleas for him to cease his assaultive conduct.

Appellant contends that he did not act recklessly when he physically struggled with A.A. because she is a correctional officer and stronger than most women. When asked during cross-examination whether she was a strong woman, A.A. testified: "Sure." Appellant asserts that because he wrestled with a strong woman, he could not have been aware that he created a substantial risk of bodily injury to her, despite

her screams and pleas for help.  Rather, Appellant claims that he only *should have known* of the substantial or unjustifiable risk of injury to A.A., the *mens rea* standard for criminal negligence, which is not a recognized culpable mental state for the offense of assault.  *See* PENAL § 22.01(a)(1).

Although Appellant presents an alternative narrative—that he was not aware of the substantial risk of bodily injury to A.A. because, as a correctional officer, she was stronger than the average woman—the jury was free to believe or to disbelieve all, some, or none of Appellant's testimony.  *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)).  It is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.  Here, we presume that the jury resolved any conflicting inferences in favor of the verdict, and we defer to that determination.  *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.  Moreover, it is not our role or function to engage in or make credibility determinations.  *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

In light of the applicable standard of review, we have reviewed the evidence in the light most favorable to the jury's verdict.  Irrespective of the competing narrative and contentions advanced by Appellant, we hold that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of the charged offense of assault family violence.  Accordingly, because legally sufficient evidence supports the jury's verdict, we overrule Appellant's sufficiency challenge concerning his conviction for assault family violence.

We now consider Appellant's sufficiency challenge to his conviction for the violations of the emergency protective order. A person commits the offense of violation of a protective order if, in violation of an order issued and served on the person under Chapter 85 of the Texas Family Code, the person knowingly or intentionally communicates in any manner with the protected individual except through the person's attorney or a person appointed by the court, if the order prohibits any communication with the protected individual. PENAL § 25.07(a)(2)(C).

The emergency protective order that was issued in this case prohibited Appellant from "communicating in any manner with [A.A.]." Here, it is undisputed that, after he was served with the emergency protective order and thereafter released from the Taylor County jail, Appellant called A.A.; however, the call was not answered. Appellant then sent a single word text message to A.A.

Citing our holding in *Feldman v. State*, Appellant contends that he did not violate the protective order because he only attempted—but failed—to communicate with A.A. *See Feldman v. State*, Nos. 11-02-00339-CR, 11-02-00340-CR, 11-02-00341-CR, 2004 WL 213005, at *1 (Tex. App.—Eastland Feb. 5, 2004, pet. ref'd) (mem. op., not designated for publication). Contrary to Appellant's assertion, *Feldman* is inapposite. There, we held that the appellant had not "communicated" with his son in violation of the protective order because the letters that the appellant had mailed to his son were never received by him because the letters had been intercepted by the boy's mother. *Id.* at *2. Here, A.A. received both the cellphone call (though she did not answer it) and the text message. Furthermore, the conditions and prohibitions of the protective order were explained to Appellant before he posted bond and was released from the Taylor County jail. As such, a rational jury could have inferred and found beyond a reasonable doubt that the unanswered cellphone call initiated by Appellant violated the protective order's prohibition of communicating with A.A. Alternatively, a rational jury could also have inferred and

found beyond a reasonable doubt that the text message that Appellant sent to A.A. constituted a prohibited communication.

Again, we have reviewed the evidence in the light most favorable to the jury's verdict.  In light of the record before us, we hold that legally sufficient evidence exists from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of violating the emergency protective order as charged in the information.  Accordingly, because legally sufficient evidence supports the jury's verdict, we overrule Appellant's sufficiency challenge concerning his conviction for violating the emergency protective order.

IV.  *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


September 30, 2021

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

12